[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-10729

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 4, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 01-00403-CV-HS-NW

NATIONAL PARKS AND
CONSERVATION ASSOCIATION INC.,
SIERRA CLUB,

Plaintiffs-Appellants,

versus

TENNESSEE VALLEY AUTHORITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(October 4, 2007)**

Before EDMONDSON, Chief Judge, TJOFLAT, and GIBSON,[*] Circuit Judges.

GIBSON, Circuit Judge.

_____

   * Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit, sitting by designation.

National Parks Conservation Association, Inc., and the Sierra Club appeal from the district court's orders dismissing with prejudice their action against the Tennessee Valley Authority brought under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a). National Parks and the Sierra Club claim that TVA violated the Act in connection with work it performed in 1982-83 on a coal-fired boiler at its power plant in Colbert County, Alabama. National Parks and the Sierra Club assert three claims against TVA; the district court denied their motion for partial summary judgment and granted TVA's motion to dismiss two of the claims as barred by the statute of limitations and the remaining claim for failure to provide proper pre-suit notice. We affirm.

## I.

The Tennessee Valley Authority is a federal agency that operates over forty electricity generating facilities, including the Colbert Plant in Tuscumbia, Alabama. The Colbert Plant uses five coal-fired boiler units to generate electricity. The process involves burning coal to create steam and passing the steam through a turbine, which drives a generator that produces electricity. National Parks and the Sierra Club claim that the Colbert Plant's operations emit harmful quantities of pollutants, specifically nitrogen oxide, particulate matter, and sulfur dioxide. Although not the subject of this suit, they have similar

complaints about TVA's operations at several other power plants located throughout Tennessee, Alabama, and Kentucky.

The allegations in this lawsuit are limited to only one of the Colbert Plant's boilers, Unit 5. Colbert Unit 5 has been in operation since 1965. In a project that began in 1982 and was completed in 1983, TVA overhauled Unit 5 to restore its lost capacity, extend its life, and reduce or eliminate forced outages. The project cost over $50 million and took three years from planning to implementation. At all relevant times, TVA has operated Unit 5 under an operating permit issued by the Alabama Department of Environmental Management pursuant to its EPA-approved State Implementation Plan; the permit prescribes emission limitations, and the Department monitors and tests the Unit's emissions to ensure compliance. TVA did not obtain construction permits before undertaking the project, however, and National Parks and the Sierra Club claim that this omission, among others, violates the Clean Air Act.

The goal of the Clean Air Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). To achieve this goal, the Act employs a program of "cooperative federalism" under which the EPA develops "National Ambient Air Quality Standards" for various pollutants. Sierra Club v. United States EPA, 315 F.3d 1295, 1300, 1296 (11th Cir. 2002). Each

3

state then formulates a "State Implementation Plan," which limits emissions for specific sources of pollution and which must be approved by the EPA, to attain and maintain those standards. Id.; see also 42 U.S.C. §§ 7409, 7410. The Act differentiates between "existing sources" of pollution and "new sources," and these two types of sources are regulated differently. New York v. United States EPA, 413 F.3d 3, 13 (D.C. Cir. 2005). Thus, TVA's obligations with respect to the project and its subsequent operation of Unit 5 depend on how Unit 5 is classified under the Act.

"New sources" of pollution include both newly built units and plants as well as existing ones that have been "modified" in a way that increases their emissions, according to the definitions set forth in the Act and EPA regulations. See, e.g., 42 U.S.C. § 7411(a)(2), (4). Unlike existing sources, new sources and modified sources are subject to the New Source Performance Standards, 42 U.S.C. § 7411, 40 C.F.R. Part 60, which impose stringent emission limitations and other requirements such as monitoring and testing. New sources and modified sources also are subject to New Source Review,[1] which requires the proponent of a

---

[1]New Source Review encompasses two regulatory programs. The "Prevention of Significant Deterioration" program governs sources located in areas that are in attainment of the EPA's air quality standards for the pollutant in question or where there is insufficient information to evaluate whether the standards have been met. See New York v. EPA, 413 F.3d at 12; 42 U.S.C. §§ 7470-7492. The "Nonattainment New Source Review" program governs sources located in areas that have not attained the air quality standards for the pollutant in question. See New York v. EPA, 413 F.3d at 12; 42 U.S.C. §§ 7501-7515. Count I of National Parks' and the Sierra Club's complaint alleges

4

proposed construction or modification to complete various requirements before the project can proceed, such as obtain construction permits and determine emission controls to be installed in the source. See 42 U.S.C. § 7475(a); Tenn. Valley Auth. v. Whitman, 336 F.3d 1236, 1244 nn.12-13 (11th Cir. 2003). The New Source Performance Standards and New Source Review programs are implemented through EPA-approved State Implementation Plans. See New York v. EPA, 413 F.3d at 11-14.

"Existing sources," in contrast, are plants, units, and other sources that were built before the EPA proposed otherwise applicable standards. 42 U.S.C. § 7411(a)(6), (2). While they are subject to several sets of regulations including State Implementation Plans, they have "grandfathered" status and are not subject to New Source Review or the New Source Performance Standards. New York v. EPA, 413 F.3d at 13. This system is intended to achieve environmental controls without unduly hampering economic growth. Id.

In 1999, the EPA charged TVA with modifying several of its units in violation of the New Source Review programs; Colbert Unit 5 was among these units. The EPA found TVA guilty in administrative proceedings and ordered it to

---

that Unit 5's emissions of nitrogen oxide and particulate matter subject TVA to the Prevention of Significant Deterioration program requirements. Count II alleges that its emissions of sulfur dioxide subject TVA to the Nonattainment New Source Review program requirements. The distinction between these two programs does not affect our analysis, so we refer to the counts collectively as the "New Source Review" claims.

5

come into compliance with the Act, but this Court refused to enforce the order after concluding that the administrative proceedings were unconstitutional. Whitman, 336 F.3d at 1260. The EPA has not pursued prosecution of TVA for these alleged violations.

After the EPA's action failed, National Parks and the Sierra Club sent TVA notice of their intent to sue for Clean Air Act violations at the Colbert Plant and nine other power plants located throughout Tennessee, Alabama, and Kentucky. Various suits were filed against TVA under the Act's citizen suit provision, 42 U.S.C. § 7604(a). Two of these were filed in the district court below, the present suit and a separate a suit filed by the Sierra Club and the Alabama Environmental Council. That separate suit alleged that TVA's operations at the Colbert Plant repeatedly violated the 20% opacity limitation, an emission limitation for particulate air pollution established by Alabama's State Implementation Plan, during the five-year period from 1997 to 2002. Sierra Club v. Tenn. Valley Auth., 430 F.3d 1337, 1339, 1141 (11th Cir. 2005). The district court granted summary judgment to TVA, holding that there could be no violations because, although the Plant's emissions exceeded the 20% opacity limitation, they were "within the forgiveness zone" of the Alabama Department of Environmental Management's 2% de minimis rule. Id. at 1339. This Court reversed in part, reasoning that the 2% de minimis rule had not been approved by the EPA and thus was not part of

6

Alabama's State Implementation Plan. Id. at 1346-47. We affirmed the dismissal of the plaintiffs' claim for civil penalties as barred by TVA's sovereign immunity but remanded for reconsideration of whether the plaintiffs were entitled to injunctive and declaratory relief for claims arising from the Plant's violations of the opacity limitation. Id. at 1357.

Meanwhile, the instant suit was pending in the district court. National Parks and the Sierra Club allege three counts, all relating to the 1982-83 project and subsequent operation of Colbert Unit 5. The first two counts allege that TVA modified Unit 5 in violation of the New Source Review programs by failing to obtain construction permits, failing to perform air quality analysis and install emission controls, failing to obtain offsets, and operating the Unit as illegally modified. The third count alleges that the Unit's pollutant emissions after the modification exceeded EPA limitations and failed to comply with other requirements of the New Source Performance Standards. National Parks and the Sierra Club seek civil penalties and declaratory and injunctive relief on all counts. They do not dispute that Colbert Unit 5 at all relevant times had an operating permit issued by the Alabama Department of Environmental Management, which monitored compliance as required by Alabama's State Implementation Plan for existing sources. To be viable, all three counts require the 1982-83 project to be characterized as a "major modification," triggering the EPA's New Source Review

7

preconstruction permitting requirements and the emission limitations established by the New Source Performance Standards described above.  TVA contends that the 1982-83 project was not a major modification and, in any event, would fall under the exception for routine maintenance, repair, and replacement.

Without deciding this issue, the district court made a series of rulings against National Parks and the Sierra Club, each of which they now challenge on appeal.  First, the district court denied National Parks' and the Sierra Club's motion for partial summary judgment on the issue of whether the 1982-83 project involving Colbert Unit 5 was a "modification," reasoning that the parties dispute several factual issues including how to measure the changes in emissions and whether the work was routine maintenance and repair according to industry standards.  Next, the district court granted in part TVA's motion for partial summary judgment on the two New Source Review counts.  The court held that the claims for civil penalties were barred on statute of limitations grounds, 28 U.S.C. § 2462, where the suit was filed in 2001, well over five years after the work on Unit 5 took place; the alleged violations of preconstruction requirements were not continuing violations; and the concurrent remedy doctrine barred the claims for injunctive and declaratory relief.  In a third order, the district court granted TVA's motion to dismiss National Parks' and the Sierra Club's New Source Performance Standards claim for failure to comply with the pre-suit notice

8

requirements of 42 U.S.C. § 7604(b). The court held that the plaintiffs' notice letter lacked specificity where it broadly alleged nearly 20 years' worth of daily violations of nearly all of the potentially applicable regulations, when in fact the New Source Performance Standards violations ultimately alleged in the complaint were confined to one pollutant.

After these rulings, the action remained in the district court awaiting consolidation with Sierra Club v. Tennessee Valley Authority, which was on appeal from the district court to this Court. After this Court handed down its decision in Sierra Club, however, the parties agreed that no issues were left for the district court to resolve in this case. Accordingly, the court dismissed the entire action. The court observed that, even if the plaintiffs could not obtain relief based on the 1982-83 project on Colbert Unit 5 in this suit, Sierra Club established that the Colbert Plant's operations violate the Clean Air Act because of the opacity limitation, and, while TVA is immune to civil penalties, declaratory and injunctive relief might be available for any viable claims. This appeal followed.

## II.

We review de novo the district court's orders granting TVA's motions to dismiss and for summary judgment, upholding them if there are no genuine issues of material fact and if TVA is entitled to judgment as a matter of law. Sierra Club, 430 F.3d at 1345-46; see also Fed. R. Civ. P. 56(c). We view the evidence in the

light most favorable to the nonmoving parties, National Parks and the Sierra Club. Fla. Pub. Interest Research Group Citizen Lobby, Inc. v. EPA, 386 F.3d 1070, 1082 (11th Cir. 2004). Thus, we assume without deciding that the 1982-83 project involving Colbert Unit 5 was a modification that triggered the New Source Review program requirements and the New Source Performance Standards. See Nat'l Parks Conservation Ass'n, Inc. v. Tenn. Valley Auth., 480 F.3d 410, 418 (6th Cir. 2007).

First, we address the district court's dismissal of National Parks' and the Sierra Club's two New Source Review claims. They allege that TVA violated various requirements of New Source Review by failing to obtain construction permits, and to install emission controls that would have been specified during the permitting process, before undertaking work on Colbert Unit 5 and by operating Unit 5 after this illegal modification. The district court dismissed these claims on statute of limitations grounds insofar as they sought civil penalties, and it dismissed the claims pursuant to the concurrent remedy doctrine insofar as they sought injunctive and declaratory relief. In the Sierra Club's separate case against TVA, this Court held that TVA has sovereign immunity on any claims for civil penalties, Sierra Club, 430 F.3d at 1353-57. In light of that decision, National Parks and the Sierra Club do not contest the dismissal of their claims for civil penalties. They contend nonetheless that the district court improperly dismissed

10

their claims for injunctive and declaratory relief. That dismissal was premised on the concurrent remedy doctrine, which arises only if the legal claims are time-barred. Thus, even though it is established that TVA's sovereign immunity bars National Parks' and the Sierra Club's legal claims, we begin by considering whether and to what extent the five-year statute of limitations also bars those claims.

A.      Statute of Limitations

Legal claims brought under the Clean Air Act are subject to the general federal five-year statute of limitations established by 28 U.S.C. § 2462, wherein the claim is barred if suit is not brought within five years of the date the claim first accrues. A claim first accrues on the date that a violation first occurs. 3M Co. (Minn. Mining & Mfg.) v. Browner, 17 F.3d 1453, 1462 (D.C. Cir. 1994). TVA argues that National Parks' and the Sierra Club's claims accrued in 1982 and 1983, when TVA undertook and completed the work on Colbert Unit 5 without obtaining construction permits, installing certain emission controls, and fulfilling other requirements of New Source Review; thus National Parks' and the Sierra Club's suit filed nearly twenty years later in 2001 is most evidently untimely. The district court agreed, holding that National Parks and the Sierra Club could not advance their New Source Review claims because TVA had done no work on Unit 5 in the five-year period immediately preceding the filing of the complaint. See

11

also Nat'l Parks, 480 F.3d at 416 ("Because § 2462 applies, for their suit to be timely, the plaintiffs must identify a wrongful act that took place within five years of their filing this suit.").

National Parks and the Sierra Club advance several theories why the district court's conclusion was incorrect. First, they argue that their claims were timely filed because TVA's violations of the Act were continuing violations. Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period. Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982). In determining whether to characterize a violation as "continuing," it is important to distinguish between the "present consequences of a one-time violation," which do not extend the limitations period, and "a continuation of a violation into the present," which does. Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 658 (11th Cir. 1993); see also Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1334 (11th Cir. 2006).

Numerous district courts have held that violations of requirements of the preconstruction permitting process do not constitute continuing violations of the Clean Air Act. See, e.g., New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003); United States v. Ill. Power Co., 245 F. Supp. 2d 951, 957-58 (S.D. Ill. 2003); United States v. Murphy Oil USA, Inc., 143 F.

12

Supp. 2d 1054, 1083-84 (W.D. Wis. 2001); <u>United States v. Westvaco Corp.</u>, 144 F. Supp. 2d 439, 443-44 (D. Md. 2001) (collecting additional cases). The district court joined this line of cases, and they persuade us, as well. The plain language of the Act states, "No major emitting facility . . . may be constructed . . . unless" the proponent of the construction or modification fulfills the enumerated requirements. 42 U.S.C. § 7475(a). From this language, it follows that "violations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis." <u>Niagara Mohawk</u>, 263 F. Supp. 2d at 661; <u>see also</u> <u>Ill. Power Co.</u>, 245 F. Supp. 2d at 957 (observing that "the Act provides separate requirements for preconstruction permits and operating permits," 42 U.S.C. §§ 7475 and 7661 <u>et seq.</u> respectively, and the plain language of the Act shows that preconstruction permitting violations occur when construction begins, not for the duration of the source's operation). This conclusion is reinforced by the very citizen suit provision National Parks and the Sierra Club invoke, which permits suit "against any person who <u>proposes to construct or constructs</u> any new or modified major emitting facility without a permit." 42 U.S.C. § 7604(a)(3) (emphasis added). "Operation" of such a facility is not articulated as a basis for a violation of New Source Review under either 42 U.S.C. § 7475(a) or § 7604(a)(3). A source's operation is regulated separately from its construction under the Act, <u>compare</u> 42 U.S.C. § 7475 (setting forth requirements to be met prior to

13

construction), with 42 U.S.C. § 7661 et seq. (governing operating permits) and 42 U.S.C. § 7411(e) ("[p]rohibited acts" under New Source Performance Standards include "to operate such [new] source in violation of any standard of performance applicable to such source"). The relevant Alabama regulations also treated construction and operating permits separately. Under such an arrangement, the statutory provisions governing preconstruction requirements "cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine exists or is operated. . . . [A] violation of the Clean Air Act's preconstruction permit requirements . . . occurs at the time of the construction or modification and is not continuing in nature." Ill. Power Co., 245 F. Supp. 2d at 957.

National Parks and the Sierra Club contend that an alternative line of cases has characterized violations of preconstruction requirements as continuing violations, citing United States v. Duke Energy Corp., 278 F. Supp. 2d 619, 651 (M.D.N.C. 2003), aff'd on other grounds, 411 F.3d 539 (4th Cir. 2005), vacated by Envtl. Def. v. Duke Energy Corp., 127 S. Ct. 1423 (2007); United States v. Marine Shale Processors, 81 F.3d 1329 (5th Cir. 1996); United States v. Am. Elec. Power Serv. Corp., 137 F. Supp. 2d 1060 (S.D. Ohio 2001). Of these cases, only the district court opinion in Duke Energy offers a rationale for treating violations of preconstruction requirements as continuing violations. However, the case is not

14

directly analogous because the state regulations at issue in <u>Duke Energy</u> integrated construction and operating permits, <u>see</u> 278 F. Supp. 2d at 652, such that compliance with preconstruction permitting requirements was a condition for the legal operation of the source. That is not the situation before us, as Alabama's State Implementation Program utilized separate construction and operating permit systems in 1982-83 during the work on Colbert Unit 5, and there is no evidence that TVA's operating permit was otherwise conditioned on its compliance with New Source Review preconstruction requirements. <u>See</u> <u>Murphy Oil</u>, 143 F. Supp. 2d at 1083 (finding no continuing violation where "nothing in the statute creates a continuing liability for a facility's failure to obtain a pre-construction permit").

Next, National Parks and the Sierra Club argue that the district court misconstrued the nature of their claims with respect to TVA's operation of Unit 5 after the allegedly illegal modification. They emphasize that TVA never installed and continues to operate without "Best Available Control Technology," emission limitations for modified sources located in areas that are in attainment of the EPA's air quality standards. Alabama regulations required the Director of the Department of Environmental Management to determine the achievable emission limitations for a specific source before granting it a construction permit, Ala. Air Pollution Control Comm'n Reg. 16.4.2(l) (1981). This source-specific Best Available Control Technology then would be specified for installation in the

15

modified source.  Because TVA never went through the preconstruction permitting process before undertaking work on Unit 5, emission limitations never were specified for the Unit.  According to National Parks and the Sierra Club, TVA nonetheless has an ongoing obligation to apply Best Available Control Technology and commits a fresh violation of the Act every time it operates Unit 5 without these emission controls.  In support of this position, they cite a portion of the governing Alabama State Implementation Plan stating that modified sources "shall apply" Best Available Control Technology, Ala. Air Pollution Control Comm'n Reg. 16.4.9(c) (1981).

National Parks and the Sierra Club also point us to a recent decision from the Sixth Circuit where they joined with another organization and litigated the timeliness of Clean Air Act claims arising from TVA's failure to undergo the preconstruction permitting process and its subsequent operations at a Tennessee plant, National Parks Conservation Association, Inc. v. Tennessee Valley Authority, 480 F.3d 410, 417 (6th Cir. 2007).  In that case, the district court had held that the plaintiffs' claims were time-barred.  Id. at 411.  A divided panel of the Sixth Circuit reversed, holding that Tennessee regulations created an ongoing obligation to install Best Available Control Technology, and thus the plaintiffs' claims were timely to the extent that they alleged that TVA failed to apply the emission controls within the limitations period.  Id. at 418-19.  Relying on this

16

decision, National Parks and the Sierra Club argue that, regardless of whether the continuing violations doctrine applies, their first New Source Review claim must survive to the extent that TVA committed a new, discrete violation every time it operated Unit 5 without Best Available Control Technology during the limitations period.

Were this case governed by Tennessee's environmental regulations, the Sixth Circuit's decision in National Parks indeed would be persuasive authority for National Parks' and the Sierra Club's position. They advance the same claim in both cases – TVA modified a source without applying Best Available Control Technology and has been in violation of the Act ever since, committing a discrete violation every time it operates the source without these emission controls. We cannot avoid the fact, however, that the obligation to apply Best Available Control Technology – like all the violations alleged in the New Source Review counts of the complaint in this suit – was solely a prerequisite for approval of the modification, not a condition of Unit 5's lawful operation, under the relevant Alabama State Implementation Plan. Thus, National Parks' and the Sierra Club's claim is completely time-barred.

The complaint charges TVA with violating the Alabama regulations in effect at the time of TVA's work on Unit 5, and these regulations govern our inquiry. A careful review of Alabama's preconstruction permitting program

17

reveals that Best Available Control Technology was to be determined and installed at the time of construction. Alabama maintained completely distinct construction and operating permit programs, and the obligation to apply Best Available Control Technology was confined to the regulations for "Permits to Construct in Clean Air Areas." While these regulations did provide that a major modification "shall apply" Best Available Control Technology, that requirement applied to "each proposed emissions unit," Ala. Air Pollution Control Comm'n Reg. 16.4.9(c) (1981) (emphasis added). Moreover, the regulations defined Best Available Control Technology as a set of source-specific emission limitations determined by the Director before construction begins. Ala. Air Pollution Control Comm'n Reg. 16.4.2(l) (1981). The Alabama regulations apparently did not provide a way for a party who had undertaken a modification to obtain such a determination outside the preconstruction permitting process. These provisions compel our conclusion that TVA's obligation to install Best Available Control Technology was to be met at construction time in 1982, and was not an ongoing duty.

While the Alabama regulations cited above and certain portions of the Tennessee regulations interpreted by the Sixth Circuit in National Parks share very similar language,[2] we conclude that an important difference in the states' plans

_____

[2]Like Ala. Air Pollution Control Comm'n Reg. 16.4.9(c), stating that a "major modification shall apply [Best Available Control Technology]" and that this "requirement applies to each proposed emissions unit," Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(j)(3) states: "A major

18

ultimately precludes us from reaching the same result as our sister circuit.

Tennessee's State Implementation Plan provided that, if a party failed to obtain a construction permit specifying emission limitations at the time of construction or modification, a construction permit could be issued at a later date "to assure that these regulatory requirements are met." Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e). The Sixth Circuit construed this provision as creating an ongoing obligation to comply with requirements of the preconstruction permitting process. National Parks, 480 F.3d at 413. National Parks and the Sierra Club have not pointed out any analogous provision in the Alabama Plan in effect in 1982, and we are not aware of one. Unlike Tennessee, Alabama limited the obligation to apply Best Available Control Technology to proposed modifications, with no caveat

_____

modification shall apply best available control technology for any pollutant for which it would result in a significant net emissions increase at the source. This requirement applies to each proposed emissions unit at which a net emissions increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit." Alabama's Best Available Control Technology requirement was classified within regulations governing "Permits to Construct in Clean Air Areas"; Tennessee's regulations at § 1200-3-9-.01 are entitled "Construction Permits." In addition, Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(a)(1) provides, "No major stationary source or major modification . . . shall begin actual construction unless the requirements of this paragraph, as applicable, have been met" (emphasis added). To the extent the Sixth Circuit interpreted the "shall apply" language by itself as creating an ongoing obligation to apply Best Available Control Technology every time the source operates, see Nat'l Parks, 480 F.3d at 418-19, even though Tennessee maintained separate construction and operating permit systems and the cited provision is embedded within a set of regulations explicitly governing "Construction Permits," see id. at 420 (Batchelder, J., dissenting), we do not adopt that interpretation of the similarly worded Alabama regulations. Without a provision imposing an ongoing duty to meet preconstruction requirements that were not met at the time of construction, there is no basis for us to conclude that National Parks' and the Sierra Club's New Source Review allegations in this case are timely under the governing Alabama regulations.

19

continuing the obligation for the operating life of the source if it was not met during the construction phase. In light of this distinction, we cannot say that TVA's failure to apply Best Available Control Technology on Unit 5 constitutes a "series of discrete violations" of the relevant Alabama regulations, Nat'l Parks, 480 F.3d at 417, some of which fall within the limitations period. See Niagara Mohawk, 263 F. Supp. 2d at 665 (courts have held that a violation of the obligation to install Best Available Control Technology before construction does not "create continuing obligations or constitute continuing violations for purposes of the application of the statute of limitations").

We likewise reject National Parks' and the Sierra Club's argument that, although TVA had an operating permit issued by the Alabama Department of Environmental Management, it continually violated the Act by failing to obtain an "Air Permit" specifying Best Available Control Technology for Unit 5 after Alabama's State Implementation Plan was amended in 1985. The 1985 amendments revised Alabama's permitting system so that construction and operating permits were combined and issued as Air Permits. They provided that a person modifying a source had to obtain an Air Permit before construction and, if that person failed to do so, the source could not operate legally until an Air Permit was obtained. Ala. Admin. Code Rule 335-3-14-.01(1)(a), (c). As a threshold matter, it is not clear that National Parks and the Sierra Club have properly

20

charged any violations of the 1985 Alabama regulations; the complaint charges TVA only with violating the Alabama preconstruction permitting regulations in effect during TVA's work on Unit 5 in 1982-83. Moreover, the 1985 amendments have no significance in this case where it is undisputed that TVA had an operating permit for Unit 5 at the relevant times. There is no indication that the 1985 amendments were to apply retroactively, reviving TVA's obligation to obtain a preconstruction permit specifying emission limitations. Rather, all construction and operating permits, the latter of which TVA had, were converted to Air Permits by operation of law in 1985. National Parks' and the Sierra Club's position amounts to an argument that TVA has been violating the Act continually by operating Unit 5 under the wrong permit, and we reject it. See United States v. AM Gen. Corp., 34 F.3d 472, 475 (7th Cir. 1994) (rejecting collateral attack on permit).

Where TVA has not been accused of violating its operating permit, Unit 5's present pollutant emissions have significance in this case only as a current ill effect of its past failure to fulfill the requirements of Alabama's preconstruction permitting program in 1982. That is not sufficient to bring National Parks' and the Sierra Club's New Source Review claims within the five-year statute of limitations, which serves several important purposes including barring stale claims and protecting expectations that have settled over time. See 3M Co., 17 F.3d at

21

1457. Under these circumstances, a plaintiff's recourse is to allege violations of the operating permit. See Niagara Mohawk, 263 F. Supp. 2d at 662; see also Murphy Oil, 143 F. Supp. 2d at 1081-82. As the district court observed, the Sierra Club apparently has done this successfully in its separate suit against TVA charging opacity limit violations at the Colbert Plant. To be sure, relief is available under the Act if those operations exceed the 20% opacity limitation, Sierra Club, 430 F.3d at 1350 – but not for the preconstruction violations alleged in this separate suit, which are time-barred.

B.    Concurrent Remedy Doctrine

By its plain language, the statute of limitations set forth in 28 U.S.C. § 2462 applies only to claims for legal relief; it does not apply to equitable remedies. United States v. Banks, 115 F.3d 916, 919 (11th Cir. 1997). Nonetheless, where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred under the concurrent remedy doctrine. Cope v. Anderson, 331 U.S. 461, 464 (1947); see also Gilbert v. City of Cambridge, 932 F.2d 51, 57 (1st Cir. 1991) (stating that "it is settled . . . that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy"); United Transp. Union v. Fla. E. Coast Ry. Co., 586 F.2d 520, 523-24 (5th Cir. 1978) (holding that, where both legal and equitable relief are sought, the statute of limitations bars both).

22

National Parks and the Sierra Club rely on <u>Banks</u> and <u>United States v.</u> <u>Cinergy Corp.</u>, 397 F. Supp. 2d 1025, 1032 (S.D. Ind. 2005), in arguing that the concurrent remedy doctrine does not bar their claims. <u>Banks</u> carved out an exception to the concurrent remedy doctrine so that statutes of limitations cannot operate to bar "claims brought by the federal government in its sovereign capacity" as enforcer of environmental regulations. 115 F.3d at 919 (government sought injunction against party discharging dredged or fill materials on wetlands in violation of Clean Water Act). National Parks and the Sierra Club argue that this exception should be extended to them because they are acting as "private attorneys general" to enforce environmental regulations for the public benefit, <u>see</u> <u>Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n</u>, 453 U.S. 1, 16- 17 (1981). There is no authority, however, for expanding the governmental exception to preclude application of the concurrent remedy doctrine in the instant suit, which was filed by private parties where the government has declined to act. The statute provides that plaintiffs in a citizen suit are acting "on [their] own behalf," 42 U.S.C. § 7604(a); though they may be acting as private attorneys general, they do not represent the public at large in the same way the government does when it brings suit to enforce the statute. See <u>Conservation Law Found. of</u> <u>New England, Inc. v. Browner</u>, 840 F. Supp. 171, 175 (D. Mass. 1993) (citing legislative history of citizen suit provision).

Alternatively, National Parks and the Sierra Club argue that the doctrine is inapplicable because their legal and equitable claims do not seek "concurrent" remedies, urging us to adopt the reasoning articulated by the Indiana district court in Cinergy. In Cinergy, the court held that the concurrent remedy doctrine did not bar a citizen suit seeking injunctive relief that was paired with a time-barred claim for civil penalties. The court held that the separate claims were not concurrent because the remedies had "different goals and effects." 397 F. Supp. 2d at 1032 (identifying the goal of civil penalties as deterrence because fine is paid to the government, while the goal of equitable relief is "to stop threats to the environment"). We are not aware of other authority for this novel distinction and are not persuaded that it is a meaningful one. We conclude that the civil penalties and equitable relief sought in this case are concurrent because "an action at law or equity could be brought on the same facts." United States v. Telluride Co., 146 F.3d 1241, 1248 n.12 (10th Cir. 1998) (internal quotations and citations omitted).

Finally, National Parks and the Sierra Club argue that, after Sierra Club established TVA's sovereign immunity on claims for civil penalties, their only claim is for equitable relief, and thus their claims for declaratory and injunctive relief must survive because they no longer have any concurrent legal claim, time-barred or otherwise, to support application of the concurrent remedy doctrine. We reject this argument. That TVA has sovereign immunity by no means renders its

24

statute of limitations defense superfluous. TVA was entitled to raise multiple defenses, and "the plaintiffs' request for civil penalties remains part of the operative complaint." Nat'l Parks, 480 F.3d at 416. Thus, we have considered whether and to what extent the five-year statute of limitations and the concurrent remedy doctrine bar the legal and equitable New Source Review claims National Parks and the Sierra Club assert in this suit, and we conclude that the district court correctly dismissed those claims. Consequently, we need not address TVA's laches defense.

## III.

In their third claim, National Parks and the Sierra Club allege that TVA's operation of Colbert Unit 5 violated the New Source Performance Standards, see 42 U.S.C. § 7411, on a daily basis for nearly twenty years. The district court dismissed the claim, holding that National Parks and the Sierra Club had failed to comply with the pre-suit notice requirement for citizen suits established by 42 U.S.C. § 7604(b). National Parks sent TVA notice of its intent to sue on October 30, 2000,[3] but the district court found the letter to be "the notice equivalent of a 'shotgun' complaint" because it broadly alleged daily violations of an entire set of

_____

[3]The Sierra Club sent a separate letter shortly thereafter notifying TVA that it intended to join National Parks' suit.

regulations without specifically identifying the individual alleged violations and dates.

We review the sufficiency of pre-suit notice de novo. See Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., 375 F.3d 913, 917 (9th Cir. 2004). In general, unless the plaintiff provides specific notice of intent to sue at least 60 days before filing the complaint, a citizen suit may not be maintained. See Hallstrom v. Tillamook County, 493 U.S. 20, 31 (1989); Nat'l Envtl. Found. v. ABC Rail Corp., 926 F.2d 1096, 1097 (11th Cir. 1991) (notice requirement "is a mandatory condition precedent to the filing of a citizen suit" under Clean Water Act). Under the Clean Air Act's citizen suit provision, at least 60 days before commencing the suit, the citizen plaintiff must give "notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order" allegedly violated. 42 U.S.C. § 7604(b)(1)(A). The notice must contain

> sufficient information to permit the recipient to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

26

40 C.F.R. § 54.3(b) (2004).  National Parks' notice letter alleged violations at ten

of TVA's coal-fired power plants in Tennessee, Alabama, and Kentucky.  The

pertinent portion of the letter for Count III of the complaint alleged that TVA

> violated regulations known as New Source Performance Standards
> ("NSPS") at Colbert Unit 5.  Pursuant to Section 111 of the Clean Air
> Act, 42 U.S.C. § 7411, EPA has promulgated standards of
> performance for a variety of major air pollution source categories,
> including electric utility steam generating units.  These standards
> apply to the owner or operator of any electric utility steam generating
> unit, "the construction or modification of which is commenced after
> the date of publication . . . of any standard . . . applicable to that
> facility."  40 C.F.R. § 60.1(a) and §§ 60.40a-49a (Subpart Da).  The
> changes [TVA] made to Colbert Unit 5 in 1983 that are discussed
> above caused an increase in the maximum hourly emissions rate
> achievable by the unit and therefore constituted a "modification" as
> that term is defined at 40 C.F.R. §§ 60.2 and 60.14(a).  Accordingly,
> beginning in 1983, [TVA was] required to meet all of the
> requirements of Subpart Da, and [TVA has] failed every day
> thereafter to do so.

National Parks and the Sierra Club first argue that they were not obligated

to provide notice.  They point out that some citizen suits under the Act are not

subject to the notice requirement, see 42 U.S.C. § 7604(a)(3) & (b), and argue that,

when a claim that requires notice is related to one that does not, both claims can

proceed without notice.  National Parks and the Sierra Club admit that, standing

alone, the New Source Performance Standards claim would require pre-suit notice,

but they argue that, because the claim has been brought with the New Source

Review claims, which would not require notice if brought under 42 U.S.C. §

27

7604(a)(3), notice was not required. After reviewing the precedent National Parks and the Sierra Club cite in support of this proposition, we reject their argument. In some cases brought under the Resource Conservation and Recovery Act and the Clean Water Act, courts have excused pre-suit notice requirements where citizens bring a "hybrid" complaint that alleges some claims that may be brought immediately and some that are subject to a waiting period after notice of intent to sue is given. See, e.g., Dague v. City of Burlington, 935 F.2d 1343, 1351-52 (2d Cir. 1991), rev'd on other grounds, 505 U.S. 557 (1992); Covington v. Jefferson County, 358 F.3d 626, 637 (9th Cir. 2004). However, the plaintiffs in these cases gave notice but did not observe the applicable waiting period; it was the excusal of this post-notice delay requirement that was squarely before the courts. Dague, 935 F.2d at 1350; Covington, 358 F.3d at 636-37. In this case, the specificity of the notice given is at issue. Thus, the "hybrid complaint" cases cited by National Parks and the Sierra Club do not give us a basis for eliminating the requirement that specific notice be given for their New Source Performance Standards claim.

Next, National Parks and the Sierra Club argue that their letter complied with the notice requirement because it provided "sufficient information to permit the recipient to identify" the nature of their New Source Performance Standards claim, as required by 40 C.F.R. § 54.3(b). They observe that the letter identified Colbert Unit 5 as the location of the violations, dated the violations as beginning

28

from 1983, and identified Subpart Da (40 C.F.R. §§ 60.40a-49a) out of the 80 subparts of 40 C.F.R. Part 60 as the governing regulations. They remind us that the notice requirement does not demand that a citizen plaintiff "list every specific aspect or detail of every alleged violation." Pub. Interest Research Group of New Jersey, Inc. v. Hercules, Inc., 50 F.3d 1239, 1248 (3d Cir. 1995). They also point out that, apart from the letter, TVA should have known exactly what violations were alleged by virtue of the administrative action the EPA had brought against it earlier, where this citizen suit was filed only as a "backstop" in case the EPA's action failed.

We conclude, as the district court did, that National Parks' notice letter was inadequate because it failed to provide enough information to permit TVA to identify the allegedly violated standards, dates of violation, and relevant activities with the degree of specificity required by the regulations. The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed. See Waterkeepers, 375 F.3d at 916-17; see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987). Rather than identifying the "specific standard" allegedly violated, National Parks' letter broadly alleged that the operation of Colbert Unit 5 violated "all of the requirements of Subpart Da." Subpart Da sets emissions standards for several pollutants including sulfur dioxide, nitrogen oxide, and particulate matter.

29

National Parks and the Sierra Club eventually discovered that TVA was in compliance with the standards for nitrogen oxide and particulate matter, and their ultimate New Source Performance Standards claim alleged only that TVA violated the standards for sulfur dioxide – a much narrower claim than the letter's broad allegations of constant violations of the entirety of Subpart Da. See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York, 273 F.3d 481, 487 (2d Cir. 2001) ("To provide adequate notice of each violation that will be targeted in the citizen suit, the [intent to sue] letter must differentiate . . . one pollutant from another," under analogous Clean Water Act notice regulations.). Similarly, the allegation that TVA has "failed every day" to comply with EPA regulations since its modification of Unit 5 in 1983 does not identify specific activities that violate the Act, and, while the letter does date these violations to a nearly 20-year span of time, this provides little guidance to TVA in identifying the violations of which it was accused. "Aiming for breadth of coverage, the letter[] substitute[s] sweeping language for the particularity required by" 40 C.F.R. § 54.3(b). Karr v. Hefner, 475 F.3d 1192, 1201 (10th Cir. 2007).

> The language of the regulation does not suggest that the notice may be good enough if it generally orients the agency or violator as to the type of violation. . . . [T]he recipient of the notice must understand from the notice what the citizen is alleging - not what the citizen could allege if the citizen knew more or cared about other possible transgressions.

30

Cal. Sportfishing Prot. Alliance v. City of W. Sacramento, 905 F. Supp. 792, 799 (E.D. Cal. 1995), quoted in Karr, 475 F.3d at 1200-01. National Parks and the Sierra Club cannot rely on TVA's participation in the EPA administrative action involving similar allegations to substitute for the lack of specificity in their letter. See Save Our Health Org. v. Recomp of Minn., Inc., 37 F.3d 1334, 1337-38 (8th Cir. 1994) (complaint dismissed because plaintiff failed to include alleged violations in notice, even though plaintiff claimed defendant had independent knowledge of violations). Thus, we affirm the dismissal of the New Source Performance Standards claim for lack of proper pre-suit notice.

## IV.

Finally, National Parks and the Sierra Club appeal the district court's order denying their motion for partial summary judgment on the issue of whether the 1982-83 project involving Colbert Unit 5 was a "major modification" triggering the requirements of New Source Review and the New Source Performance Standards. Because we affirm the dismissal of their claims while assuming the project was a major modification, it is not necessary to review this order. In any event, we lack jurisdiction to review this denial of the motion for summary judgment because it is not an appealable final judgment under 28 U.S.C. § 1291. See Valdes v. Crosby, 450 F.3d 1231, 1235 (11th Cir. 2006).

31

For the above reasons, the dismissal of this action is **affirmed** in its entirety.