# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2862

_____

| | | |
|---|---|---|
| Sierra Club, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Otter Tail Power Company; | * | |
| MDU Resources Group, Inc.; | * | |
| Northwestern Corporation, d/b/a | * | |
| Northwestern Energy, | * | Appeal from the United States |
| | * | District Court for the |
| Appellees. | * | District of South Dakota. |
| _____ | * | |
| | * | |
| State of South Dakota, | * | |
| | * | |
| Amicus on Behalf of | * | |
| Appellees, | * | |
| | * | |
| United States Environmental | * | |
| Protection Agency, | * | |
| | * | |
| Amicus Curiae. | * | |
| | * | |

_____

Submitted: May 11, 2010
Filed: August 12, 2010

_____

Before RILEY, Chief Judge, JOHN R. GIBSON and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Sierra Club brought this Clean Air Act (CAA) citizen suit against Otter Tail Power Company, MDU Resources Group, and Northwestern Energy, who own and operate the Big Stone Generating Station, a coal fired power plant near the border between South Dakota and Minnesota. Sierra Club alleged that Otter Tail violated the CAA by failing to obtain permits for a series of modifications to the plant and by exceeding applicable emission limits. The district court[1] granted Otter Tail's motion to dismiss, and Sierra Club timely appealed. We affirm.

I.

Since the factual allegations underlying this controversy are tied into the CAA and its related regulations, we begin with an examination of the applicable statutory and regulatory framework. Then we will turn to the factual and procedural background of the case.

A.

Congress enacted the Clean Air Act Amendments of 1970 seeking "'to guarantee the prompt attainment and maintenance of specified air quality standards.'" Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 469 (2004) (quoting Union Elec. Co. v. EPA, 427 U.S. 246, 249 (1976)). To that end, it "directed EPA to devise National Ambient Air Quality Standards (NAAQS) limiting various pollutants, which the States were obliged to implement and enforce." Envtl. Defense v. Duke Energy Corp., 549 U.S. 561, 566 (2007) (citing 42 U.S.C. §§ 7409, 7410).

---

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

A central part of the CAA's regulatory scheme was the New Source Performance Standards (NSPS) program, which required EPA to develop "technology-based performance standards" designed to limit emissions from major new sources of pollution. Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 846 (1984); see 42 U.S.C. § 7411(b) (2006). "New sources" include both newly constructed facilities and those that have been modified such that their emissions increase. Duke Energy, 549 U.S. at 566–67 (citing 42 U.S.C. § 7411(a)(2)). It is "unlawful for any owner or operator of any new source to operate such source in violation of" applicable performance standards. 42 U.S.C. § 7411(e).

The Supreme Court has pointed out that the NSPS program "did too little to 'achieve the ambitious goals of the 1970 amendments.'" Duke Energy, 549 U.S. at 567 (quoting R. Belden, Clean Air Act 7 (2001)) (alteration omitted). Merely setting emissions limits failed to improve air quality in those areas that had already attained the minimum standards of the NAAQS because polluters had no incentive to diminish emissions below the established limits. Congress therefore amended the CAA again in 1977 to add the "Prevention of Significant Deterioration" (PSD) program, which seeks to ensure that the "air quality floor" established by the NAAQS does not "in effect become a ceiling." Sierra Club v. Thomas, 828 F.2d 783, 785 (D.C. Cir. 1987).

Under the PSD program, "[n]o major emitting facility . . . may be constructed" or modified unless it meets certain preconditions. 42 U.S.C. §§ 7475(a); 7479(2)(C) ("The term 'construction' . . . includes . . . modification."). Among the preconditions relevant here are that the facility must obtain a permit setting forth applicable emission limitations, § 7475(a)(1), and that it must be subject to "best available control technology" (BACT), § 7475(a)(4). BACT, despite what the term implies, is not a particular type of technology. Rather, it is an "emission limitation based on the maximum degree of reduction of each pollutant subject to regulation . . . which the permitting authority, on a case-by-case basis, taking into account energy,

environmental, and economic impacts and other costs, determines is achievable" for the facility in question.  Id. § 7479(3).

The PSD program is primarily implemented by the states through "state implementation plans" (SIPs).  Id. § 7471.  States have broad discretion in designing their SIPs, but the plans must include certain federal standards and are subject to EPA review and approval.  See Alaska Dep't of Envtl. Conservation, 540 U.S. at 470.  At all times relevant to this case, South Dakota had not yet incorporated approved PSD provisions into its SIP and the federal PSD regulations set forth at 40 C.F.R. § 52.21 therefore govern this case.  See id. § 52.21(a)(1).[2]

In 1990 Congress again amended the CAA to require each covered facility to obtain a comprehensive operating permit setting forth all CAA standards applicable to that facility.  See 42 U.S.C. § 7661a(a).  These "Title V" permits do not generally impose any new emission limits, but are simply intended to incorporate into a single document all of the CAA requirements governing a facility.  See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC, 548 F.3d 738, 742 (9th Cir. 2008).  Similar to other CAA programs, Title V is implemented primarily by the states under EPA oversight.  See id.  In states with EPA approved programs, Title V permits are issued by the state permitting authority, but are subject to EPA review and veto.  See id. at 742–43; 42 U.S.C. § 7661d.

---

[2]EPA approved South Dakota's PSD program in 2007.  See 72 Fed. Reg. 72,617 (Dec. 21, 2007).  The South Dakota PSD regulations now incorporate the federal regulations by reference.  See S.D. Admin. R. 74:36:09:02.

B.

The Big Stone Generating Station is a 450 megawatt coal fired power plant located in Big Stone City, South Dakota.[3]  Otter Tail Power Company operates the plant, which it jointly owns with MDU Resources Group and Northwestern Energy (the three appellees will be collectively referred to as Otter Tail).  Big Stone has undergone various physical and operational modifications since it began operating in 1975.  Sierra Club alleges that three of those modifications triggered PSD and NSPS obligations which Otter Tail has violated.

The first modification at issue was a change in the primary fuel used at Big Stone.  The plant was originally designed to burn lignite coal, but in 1995 it switched to subbituminous coal.  Sierra Club claims that this significantly increased Big Stone's emissions of nitrogen oxides and particulate matter, meaning that Otter Tail was required to obtain a PSD permit before making the change.  Otter Tail did not seek one.

In 1998 Big Stone's boiler was modified to increase the surface area of its primary superheater.  Sierra Club claims that this modification increased the plant's emission of sulfur dioxide and nitrogen oxides and that Otter Tail was accordingly obligated to obtain a PSD permit for it.  Otter Tail did not apply for such a permit.

Finally, in 2001 Big Stone underwent physical and operational modifications to allow it to supply steam to a nearby ethanol plant.  Otter Tail applied to the South Dakota Department of Environment and Natural Resources (DENR)—the agency responsible for administering South Dakota's Title V program—for an amendment to its Title V permit to allow the ethanol plant project.  DENR invited public comment

---

[3]Our recitation of the facts relies on the allegations in Sierra Club's complaint which, in this appeal from the grant of a motion to dismiss, are taken as true. Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009).

-5-

on the permit application, but Sierra Club did not participate in the permitting process. After evaluating the proposed project and concluding that it did not involve modifications that triggered NSPS or PSD requirements, DENR approved the amended permit. Sierra Club now alleges that the ethanol plant project did trigger NSPS and PSD obligations.

Sierra Club commenced this suit in June 2008 under the CAA's "citizen suit" provision, 42 U.S.C. § 7604(a), seeking assessment of civil penalties against Otter Tail as well as declaratory and injunctive relief. It alleged that Otter Tail had violated the CAA by failing to obtain PSD permits before commencing the three modifications described above. It also claimed that Otter Tail continued to violate the CAA by operating without permits and without abiding by the BACT emission limits which would have been imposed as part of the PSD permitting process. Finally, Sierra Club alleged that Big Stone was operating in violation of NSPS limits triggered by the 2001 ethanol plant project.

Otter Tail moved to dismiss, arguing that Sierra Club's PSD claims were untimely and that the NSPS claim was an impermissible collateral attack on Otter Tail's operating permit. The district court granted the motion. It interpreted the CAA's PSD provisions as imposing upon operators only a one time obligation to obtain a permit before construction or modification of a facility, as opposed to imposing ongoing conditions on its operation. It reasoned that any violation of these provisions would have thus occurred when modifications were commenced. Since the last modification was begun in 2001, Sierra Club's PSD civil penalty claims were barred by the five year statute of limitations in 28 U.S.C. § 2462. Although § 2462 does not apply to equitable relief, the district court decided that Sierra Club's claims for equitable relief were foreclosed under the concurrent remedy doctrine because its civil penalty claims were time barred.

The district court dismissed the NSPS claim for lack of subject matter jurisdiction. Because that claim essentially attacks the terms of Otter Tail's amended Title V permit rather than Otter Tail's compliance with the permit, the district court concluded that Sierra Club should have raised the NSPS issue in administrative proceedings during the permitting process. Since judicial review of issues that may be raised through that process is vested exclusively in the courts of appeals, the district court determined that it lacked jurisdiction over the NSPS claim.

The district court denied Sierra Club's subsequent motion for reconsideration under Fed. R. Civ. P. 59(e), and Sierra Club timely appealed. It advances three arguments on appeal. First, it maintains that the CAA's PSD provisions establish ongoing conditions on the operation of polluting facilities. Otter Tail continues to violate those conditions each day that it operates, Sierra Club argues, and therefore the PSD civil penalty claims are timely. Second, it contends that the district court misapplied the concurrent remedy doctrine and that its claims for equitable relief are timely even if its PSD civil penalty claims are not. Finally, Sierra Club argues that the district court erred in concluding that it lacked subject matter jurisdiction over the NSPS claim related to the 2001 modifications at Big Stone.

We address each of these three arguments in turn. In doing so, we accept as true the complaint's factual allegations and review de novo the district court's legal conclusions. Braden, 588 F.3d at 591.

II.

We first consider whether Sierra Club timely asserted its claims for civil penalties under the Clean Air Act's PSD provisions. The CAA itself establishes no limitation period for the commencement of citizen suits. The parties agree, however, that the general federal statute of limitations at 28 U.S.C. § 2462 applies. See Nat'l Parks & Conservation Assoc., Inc. v. Tennessee Valley Authority, 502 F.3d 1316,

1322 (11th Cir. 2007) (Nat'l Parks 11th Cir.). Section 2462 provides that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."

A claim first accrues "as soon as the right to institute and maintain a suit arises." Konecny v. United States, 388 F.2d 59, 65 (8th Cir. 1967). 42 U.S.C. § 7475(a) provides that "[n]o major emitting facility . . . may be constructed . . . unless" it meets the various PSD requirements, and the CAA's citizen suit provision authorizes suit "against any person who proposes to construct or constructs any new or modified major emitting facility without a [PSD] permit . . . ." Id. § 7604(a)(3). It is thus clear that each of Sierra Club's PSD claims first accrued upon commencement of the relevant modification at Big Stone.[4]

Since the last of the modifications at issue here were done in 2001 and Sierra Club did not file suit until 2008, its civil penalty claims are barred by § 2462 unless it can "identify a wrongful act that took place within five years of [its] filing." Nat'l Parks Conservation Assoc., Inc. v. Tennessee Valley Authority (Nat'l Parks 6th Cir.), 480 F.3d 410, 416 (6th Cir. 2007). Sierra Club maintains that it can. It reads § 7475(a) and related regulations to prohibit operation of a facility without a PSD permit and the BACT emission limits that come with it, rather than only prohibiting construction or modification without satisfying those requirements. Sierra Club contends that Otter Tail violates the CAA—and a new claim accrues—every day that Big Stone operates without the applicable permits.

We are thus presented with a pure question of statutory interpretation. Do the CAA and related regulations prohibit only construction or modification of a facility

---

[4]"Construction" in this context includes modification. See 42 U.S.C. § 7479(2)(C); Duke Energy, 549 U.S. at 568.

without a PSD permit and BACT, or do they impose ongoing operational requirements? If they apply only to construction and modification, Sierra Club's PSD civil penalty claims are time barred. If they impose operational requirements, however, the PSD claims would still be viable. This is a question of first impression in our circuit. Two other courts of appeals have addressed it and have reached different conclusions. Compare Nat'l Parks 6th Cir., 480 F.3d at 418–19 (finding that PSD regulations in Tennessee SIP impose ongoing duties to obtain a PSD permit and apply BACT), with Nat'l Parks 11th Cir., 502 F.3d at 1323–25 (finding no ongoing obligations PSD in Alabama SIP). Each side in this case urges reliance on the precedent supporting its desired outcome.[5]

We begin our inquiry with the language of the statute. As already indicated, the operative statutory provision states that "[n]o major emitting facility . . . may be constructed" without meeting the PSD requirements. 42 U.S.C. § 7475(a) (emphasis added). This language unambiguously indicates that the PSD requirements are conditions of construction, not operation. See Nat'l Parks 11th Cir., 502 F.3d at 1322 ("'[V]iolations of the preconstruction permitting requirements occur at the time of construction, not on a continuing basis.'") (quoting New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003)); United States v. Ill. Power Co., 245 F. Supp. 2d 951, 957 (S.D. Ill. 2003) ("[T]he plain language of the [PSD] provisions demonstrates that any preconstruction violation occurs when the actual construction is commenced, and not at some later point in time."); see also Sierra Club v. Franklin County Power of Ill., LLC, 546 F.3d 918, 928 (7th Cir. 2008).

---

[5]Numerous district court decisions have also addressed this question, with a majority concluding that PSD obligations are not ongoing. See Ivan Lieben, Catch Me If You Can—The Misapplication of the Federal Statute of Limitations to Clean Air Act PSD Permit Program Violations, 38 Envtl. L. 667, 684–697 (2008) (collecting cases).

The language of the CAA's citizen suit provision is similarly limited to construction or modification, for it authorizes suit "against any person who proposes to construct or constructs" a facility without a permit. 42 U.S.C. § 7604(a)(3) (emphasis added). Thus, neither the statutory provision that creates the legal duty at issue here nor the provision for private enforcement gives any indication that the CAA imposes ongoing operational conditions under the PSD program. In short, "'[o]peration' of . . . a facility [without a permit] is not articulated as a basis for a violation . . . under either 42 U.S.C. § 7475(a) or § 7604(a)(3)." Nat'l Parks 11th Cir., 502 F3.d at 1323.[6]

Our interpretation of §§ 7475(a) and 7604(a)(3) is bolstered by the observation that other parts of the CAA clearly establish operational conditions, and they do so by employing plain and explicit language. 42 U.S.C. § 7411(e) makes it "unlawful . . . to operate" a facility in violation of NSPS. Title V likewise prohibits "operat[ion] . . . except in compliance with a permit . . . ." Id. § 7661a(a). "Where Congress includes particular language in one section of a statute but omits it in another section . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (alteration and citation omitted). The fact that these sections actually use the word "operate" supports the inference that the term was intentionally omitted from the PSD provisions. Where Congress has intended to establish operational conditions under the Clean Air Act, it has clearly said so. But it has not done so for the PSD program.

---

[6]Sierra Club contends that its suit is also authorized by § 7604(a)(1). That provision allows a private action for violation of "an emission standard or limitation," which is defined to include "any requirement to obtain a permit as a condition of operations." § 7604(f)(4). This does not provide independent support for Sierra Club's claim that the PSD provisions impose ongoing obligations, however, for it does not answer the central question—whether a PSD permit is a "condition of operations."

-10-

Sierra Club contends, however, that several regulatory provisions establish an ongoing duty for a polluting facility to obtain a PSD permit and to employ BACT as conditions of operation. It points first to a section of South Dakota's SIP which provides that a "person may not construct, install, modify, revise, or operate any source or unit . . . until the applicable preconstruction permit or Part 70 operating permit has been issued . . . ." S.D. Admin. R. 74:36:05:02. Sierra Club argues that this rule prohibits operation without a permit, but a close reading shows that interpretation is incorrect.

Rule 74:36:05:02 addresses preconstruction permits and operating permits in the disjunctive—it says a source may not be operated "until the applicable preconstruction permit <u>or</u> . . . operating permit" is issued (emphasis added). Sierra Club reads those requirements in the conjunctive, effectively replacing "or" with "and." In fact the rule simply says that a facility must have the permit "applicable" to the activity it seeks to undertake—whether construction or operation—but it does not indicate which permit is applicable to which activity. It thus provides no interpretive guidance here.

Sierra Club next points to a provision in the federal PSD regulations which it contends establishes an ongoing duty to obtain a permit. 40 C.F.R. § 52.21(r)(1) provides:

> Any owner or operator who constructs or operates a source or modification not in accordance with the application submitted pursuant to this section or with the terms of any approval to construct, or any owner or operator of a source or modification subject to this section who commences construction . . . without applying for and receiving approval hereunder, shall be subject to appropriate enforcement action.

Some courts have read similar language in state SIPs to mean that it is unlawful to operate a facility not in accordance with an approved PSD permit. <u>See</u>, <u>e.g.</u>, <u>United</u>

States v. E. Ky. Power Coop., Inc., 498 F. Supp. 2d 970, 974–75 (E.D. Ky. 2007) (construing materially identical provision in Kentucky's SIP). Once again, a close reading of the regulation reveals flaws in such an interpretation. With respect to operation, § 52.21(r)(1) requires compliance with two specific items: (1) "the [permit] application submitted" and (2) "any approval to construct." These provisions do not by their terms establish a freestanding duty to obtain a permit. Instead, they presume a permit application has been submitted and require operation in compliance with it—they refer to "the application submitted," not "an application." Cf. E. Ky. Power, 498 F. Supp. 2d at 975 (concluding that analogous Kentucky regulation prohibits operation "not in accordance with a submitted application") (emphasis added).

Insofar as § 52.21(r)(1) imposes an obligation to obtain a permit in the first place (which it does in its second clause), it ties that obligation explicitly to construction and not operation, subjecting to enforcement action "any owner or operator . . . who commences construction . . . without applying for and receiving approval." The clear language of this regulation is thus consistent with our interpretation of 42 U.S.C. §§ 7475(a) and 7604(a)(3). Read as a whole, § 52.21(r)(1) obliges a facility to obtain a permit before commencing construction and requires that, having done so, the facility operate in accordance with the permit application and approval. Where, as here, the operator never applied for any PSD permits, there is no application and no approval with which it can comply. Thus, while Otter Tail may have violated § 52.21(r)(1) by failing to apply for PSD permits in the first place, it does not continue to do so by failing to comply with a hypothetical set of operational parameters that would have been developed through the permitting process.

Sierra Club also argues that 40 C.F.R. § 52.21(j)(3) imposes an ongoing duty to employ BACT, regardless of whether a facility obtained a PSD permit before construction or modification. That regulation provides that a "major modification shall apply best available control technology for each regulated NSR pollutant . . . . This requirement applies to each proposed emissions unit at which a net emissions

increase in the pollutant would occur as a result of a physical change or change in the method of operation in the unit." Emphasizing the imperative phrase "shall apply," the Sixth Circuit interpreted similar language in Tennessee's SIP as creating "an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain." Nat'l Parks 6th Cir., 480 F.3d at 418.

We cannot agree with this interpretation. The context of § 52.21(j)(3) shows that the command to apply BACT is not a freestanding requirement. Rather, it is tied specifically to the construction process. Subsection (j)(3) "applies to each proposed . . . unit" (emphasis added); see Nat'l Parks 11th Cir., 502 F.3d at 1324–25. In addition, 40 C.F.R. § 52.21(a)(2)(ii) provides that "paragraphs (j) through (r) of this section apply to the construction of any new major stationary source or the major modification of any existing major stationary source . . . ." In light of these provisions, § 52.21(j)(3) is best understood as requiring that BACT limits be incorporated into a facility's construction plans and PSD permits, not as establishing an ongoing duty to apply BACT independent of the permitting process.

This conclusion is bolstered by the practical nature of BACT. BACT limits are tailored to each facility "on a case-by-case basis" during the PSD permitting process. 42 U.S.C. § 7479(3); see also 40 C.F.R. § 52.21(b)(12). They are thus inextricably linked to the permitting process. Having determined that there is no ongoing duty to obtain PSD permits, it would make little sense to conclude that Otter Tail must nevertheless abide by the BACT limits which are a product of such permits. See Nat'l Parks 11th Cir., 502 F.3d at 1325 (finding no ongoing duty to apply BACT where SIP "did not provide a way for a party who had undertaken a modification to obtain . . . a determination [of BACT limits] outside the preconstruction permitting process"). The duty to obtain a PSD permit and the duty to apply BACT are most sensibly construed as going hand in hand.

-13-

The Sixth Circuit's National Parks decision is distinguishable from the present case for this very reason. That decision relied on a provision in the Tennessee SIP which allowed for the issuance of a PSD permit even after construction had been completed "'to assure that . . . regulatory requirements are met.'" Nat'l Parks 6th Cir., 480 F.3d at 419 (quoting Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e)). Because this rule would allow a facility to obtain a determination of BACT limits through a postconstruction permitting process, the Sixth Circuit's conclusion that in Tennessee there were ongoing duties both to obtain a permit and to employ BACT made sense. Sierra Club has pointed to no similar rule in South Dakota, and its contention that there is an independent ongoing duty to apply BACT is therefore not persuasive. Cf. Nat'l Parks 11th Cir., 502 F.3d at 1325 (distinguishing Sixth Circuit's decision because Alabama SIP lacked provision similar to § 1200-3-9-.01(1)(e)).

Finally, Sierra Club and EPA as amicus curiae argue that the CAA and PSD regulations should be interpreted as establishing operational duties because the purpose of the PSD program is to limit emissions on a continuous basis and because PSD permits impose requirements on the operation of the facilities they govern. Some district courts have taken this approach. See, e.g., United States v. Duke Energy Corp., 278 F. Supp. 2d 619, 650 (M.D.N.C. 2003); United States v. Ohio Edison Co., No. 2:99-CV-1181, 2003 WL 23415140, at *6 (S.D. Ohio Jan. 17, 2003). While it is true that PSD permits establish emission limits and thus regulate operation, that does not compel the conclusion Sierra Club reaches. Even though the preconstruction permitting process may establish obligations which continue to govern a facility's operation after construction, that does not necessarily mean that such parameters are enforceable independent of the permitting process. See Nat'l Parks 11th Cir., 502 F.3d at 1323 ("[T]he statutory provisions governing preconstruction requirements 'cannot reasonably be construed to mean that building or altering a machine without a permit is a violation that continues as long as the machine exists or is operated.'") (quoting Ill. Power Co., 245 F. Supp. 2d at 957).

-14-

For these reasons we conclude that the plain language of the statute and the regulations applicable to Otter Tail prohibited only modification of the Big Stone plant without a PSD permit or BACT, not its operation .[7] If Otter Tail violated the CAA's PSD provisions, it did so more than five years before Sierra Club brought this action. Accordingly, Sierra Club's claims for civil penalties for Otter Tail's alleged PSD violations are barred by the five year statute of limitations in 28 U.S.C. § 2462.

## II.

We next consider the district court's dismissal of Sierra Club's claims for equitable relief based on Otter Tail's alleged PSD violations. 28 U.S.C. § 2462 by its terms applies only to claims for "any civil fine, penalty, or forfeiture," and therefore does not bar equitable remedies. Nat'l Parks 11th Cir., 502 F.3d at 1326. The district court nevertheless dismissed Sierra Club's claims for declaratory and injunctive relief under the concurrent remedy doctrine. That doctrine, as explained by the Eleventh Circuit, provides that "where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred" as well. Id. Because the civil penalty claims were barred by § 2462, the district court concluded that the concurrent equitable relief Sierra Club sought was barred as well.

Sierra Club argues that the district court misapplied the concurrent remedy doctrine. It contends that the doctrine applies only to equitable remedies that are similar in nature to the legal remedy sought. Sierra Club argues that the equitable

---

[7]EPA argues that we should defer to its contrary interpretation of the statute and regulations, but we conclude that such deference would be inappropriate here, where our interpretation is based on their clear and unambiguous language. See In re Old Fashioned Enters., Inc., 236 F.3d 422, 425 (8th Cir. 2001) ("Under Chevron, if from the plain meaning of the statute Congressional intent is clear . . . 'that is the end of the matter.'") (quoting Chevron, 467 U.S. at 842); Christensen v. Harris County, 529 U.S. 576, 588 (2000) ("Auer deference is warranted only when the language of the regulation is ambiguous.").

relief it seeks is different in nature and serves different purposes than the civil penalties and is thus not "concurrent." Otter Tail maintains in contrast that regardless of the different natures of the remedies, the doctrine applies whenever equitable relief could be available for the same cause of action as a time barred legal remedy.

While Sierra Club's understanding of the concurrent remedy doctrine has limited support, see United States v. Cinergy Corp., 397 F. Supp. 2d 1025, 1032 (S.D. Ind. 2005), the great weight of authority supports Otter Tail's view. In Russell v. Todd, 309 U.S. 280, 289 (1940), the Supreme Court explained that "when the [equity] jurisdiction of the federal court is concurrent with that at law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations." Numerous federal courts have understood this principle to bar equitable relief wherever time barred legal remedies would have been available to vindicate the same right. For example, in Saffron v. Dep't of the Navy, 561 F.2d 938 (D.C. Cir. 1977), the plaintiff sued for wrongful discharge, seeking both reinstatement and damages. Id. at 940. The court reasoned that while the former remedy was equitable and the latter legal, "there [was] in fact but a single right and a single default involved." Id. at 943 (alteration and citation omitted). "This," the court determined, was "the kind of parallelism that demonstrates applicability of the concurrency rule." Id. (citing Russell, 309 U.S. at 291).

Other circuits have applied the doctrine similarly. See, e.g., Williams v. Walsh, 558 F.2d 667, 673 (2d Cir. 1977) (Section 1983 plaintiff was "barred from seeking the equitable remedy of reinstatement because his concurrent legal remedy [was] barred by the applicable state statute of limitations."); Nemkov v. O'Hare Chicago Corp., 592 F.2d 351, 354–55 (7th Cir. 1979) ("If . . . the sole remedy is not in equity and an action at law can be brought on the same facts, the remedies are concurrent" for purposes of the concurrent remedy doctrine.). More particularly, the Eleventh Circuit applied the doctrine in its National Parks decision to bar equitable relief under just the same circumstances present here, concluding that "the civil penalties and equitable

relief sought . . . are concurrent because 'an action at law or equity could be brought on the same facts.'" Nat'l Parks 11th Cir., 502 F.3d at 1327 (quoting United States v. Telluride Co., 146 F.3d 1241, 1248 n.12 (10th Cir. 1998)).

The rule in this circuit is in accord with the foregoing decisions. In Roemmich v. Eagle Eye Dev., LLC, 526 F.3d 343 (8th Cir. 2008), we stated that "where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute." Id. at 352 (citation omitted). Following that principle, we conclude that because Sierra Club's PSD civil penalty claims are barred by the statute of limitations, the equitable remedies it seeks under those causes of action are barred as well. The district court therefore did not err in dismissing Sierra Club's PSD claims for equitable relief.

III.

We turn finally to Sierra Club's claim that the 2001 ethanol plant project at Big Stone triggered emission limits under the CAA's New Source Performance Standards (NSPS) program. Sierra Club contends that the 2001 modifications at the plant made it a "new source" subject to NSPS limits on sulfur dioxide emissions, and that Otter Tail has continued to operate the plant in violation of those limits.[8] The district court dismissed this claim as an impermissible collateral attack on Otter Tail's Title V operating permit. It concluded that Sierra Club should have raised the claim administratively, under 42 U.S.C. § 7661d, during the period when the South Dakota DENR and EPA were reviewing Otter Tail's application for a modification to its permit to authorize the project. Had it done so, Sierra Club would have been able to obtain judicial review of the NSPS issue in this court under id. § 7607(b)(1). Because § 7607(b)(2) precludes judicial review of EPA action "with respect to which review

---

[8]Unlike the PSD claims, the NSPS claim is not time barred because it is "unlawful . . . to operate" a polluting facility in violation of applicable NSPS provisions. 42 U.S.C. § 7411(e).

could have been obtained" under subsection (b)(1), the district court determined that it lacked subject matter jurisdiction over the NSPS claim.

Sierra Club argues that the district court misinterpreted the CAA's judicial review provisions. It contends first that EPA took no action with respect to the 2001 modifications that could have been subject to judicial review, and thus § 7607(b)(2) does not apply. Second, it argues that the district court's dismissal of the NSPS claim nullified the CAA's "permit shield" provision, 42 U.S.C. § 7661c(f), which can allow an operator to rely on its permit as a defense in an enforcement action but which was not available to Otter Tail in this case.

We begin our analysis by examining the interplay between 42 U.S.C. §§ 7661d and 7607. Section 7661d establishes a comprehensive scheme for EPA review of proposed Title V permits. See Romoland, 548 F.3d at 742–43. It requires state permitting authorities to submit permit applications and proposed permits to EPA for review. § 7661d(a)(1). "If any permit contains provisions that are determined by the Administrator as not in compliance with the applicable requirements . . . the Administrator shall . . . object to its issuance" within 45 days. § 7661d(b)(1). If the Administrator does object, the permit may not be issued unless it is revised to meet the objections. §§ 7661d(b)(3), (c). If EPA does not object to a proposed permit, "any person may petition the Administrator within 60 days after the expiration of the 45-day review period . . . to take such action." § 7661d(b)(2). The Administrator must then grant or deny the petition within 60 days. Id. "Any denial of such petition shall be subject to judicial review under" 42 U.S.C. § 7607. Id.

Section 7607(b)(1) provides in turn for direct review of the Administrator's decision in the courts of appeals. See Romoland, 548 F.3d at 743. Section 7607(b)(2) further provides that "[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."

We agree with the district court that these statutory provisions divested it of jurisdiction over Sierra Club's NSPS claim because they establish an exclusive avenue for circuit court review of the EPA's failure to object to a proposed Title V permit, and thus of a claim that a proposed permit does not comply with the CAA. See Romoland, 548 F.3d at 755.

Sierra Club's NSPS claim could have been raised during the permitting process for the 2001 modifications at Big Stone. Otter Tail applied for an amendment to its Title V operating permit when it undertook those modifications. DENR gave public notice of the proposed amendment and invited public comment in accordance with South Dakota's SIP. See S.D. Admin. R. 74:36:05:17. Sierra Club did not comment or request a hearing on the proposed permit.[9] After evaluating the proposed modifications, DENR determined that they would not trigger NSPS. Sierra Club now alleges that they did. Its claim is thus not that Otter Tail is operating in violation of its permit, but rather that the permit omitted applicable CAA requirements. This amounts to an allegation that the permit is "not in compliance with the requirements of" the CAA, § 7661d(b)(1), a claim which could have been pressed during the permitting process. See Romoland, 548 F.3d at 751, 754–55 (applying §§ 7661d and 7607 where plaintiffs were "not challenging [defendant's] compliance with the terms of its permit but [were] rather asserting that the permit itself violate[d]" the SIP); see also Nat'l Parks Conservation Ass'n, Inc. v. Tennessee Valley Authority, 175 F. Supp. 2d 1071, 1079 (E.D. Tenn. 2001).

Had Sierra Club raised its NSPS claim during the permitting process, it could have obtained judicial review. By petitioning EPA to object to the issuance of the permit, Sierra Club would have forced it to evaluate the NSPS claim. § 7661d(b)(2) ("The Administrator shall grant or deny such petition within 60 days . . . ."). If EPA

---

[9]Sierra Club protests that the public notice of the proposed permit amendment was not sufficiently specific to allow it to raise the NSPS issue. It has not pointed to any legal inadequacy in the notice, however.

refused to object, Sierra Club would have been entitled to direct review in this court under § 7607(b). Id. EPA's failure to object to the issuance of Otter Tail's amended Title V permit was thus "[a]ction of the Administrator with respect to which review could have been obtained under" § 7607, and consequently it is "not . . . subject to judicial review" in this enforcement action. § 7607(b)(2); see Romoland, 548 F.3d at 755 ("[B]y creating in 42 U.S.C. § 7661d(b)(2) an avenue of judicial review that passes through 42 U.S.C. § 7607, Congress effectively foreclosed the alternative avenue of citizen suit enforcement through 42 U.S.C. § 7604.").

Sierra Club and amicus EPA nevertheless maintain that § 7607 is inapplicable because the Administrator never took any "action" within the meaning of § 7607(b)(2). They contend that EPA's failure to object to the amended permit was not action but inaction, and they argue that in the permit review context, no action to which § 7607(b)(2) might apply occurs until someone actually petitions EPA to object to a proposed permit. We are not persuaded.

In considering whether § 7607(b)(2) precludes district court review of the NSPS claim, we are not informed by any technical definition of the term "action," for none is furnished in this context. See Harrison v. PPG Indus., Inc., 446 U.S. 578, 589 (1980) ("[T]he phrase, 'any other final action,' [in § 7607(b)(1),] must be construed to mean exactly what it says, namely, any other final action.") (emphasis in original). Nor can we rely on some abstract distinction between agency action and inaction. Instead, we must look to the particular terms of § 7607 and the procedure established by § 7661d. See, e.g., United States v. Bean, 537 U.S. 71, 75–76 (2002) (focusing on the "text of [18 U.S.C. § 925(c), the relevant judicial review provision,] and the procedure it lays out for seeking relief" to determine whether inaction by Bureau of Alcohol, Tobacco, and Firearms was subject to judicial review). EPA's failure to object was "action" in the relevant statutory sense if it had placed Sierra Club in a position such that it "could have . . . obtained" judicial review of the issue. See, e.g., Thomas, 828 F.2d at 793 (Section 7607(b)(1) establishes circuit court jurisdiction to

review "agency inaction . . . when administrative inaction has precisely the same impact on the rights of the parties" as action.) (internal quotation marks omitted).

The Ninth Circuit took such an approach in its Romoland decision, rejecting the very argument Sierra Club and EPA advance here. It concluded that the "'use it or lose it' provision of . . . § 7607(b)(2) does not bar enforcement proceedings only where an individual has . . . petition[ed] the EPA Administrator and then appeals the denial of such a petition . . . ; instead, judicial review through civil or criminal enforcement proceedings is unavailable whenever an individual 'could have . . . obtained' such review." Romoland, 548 F.3d at 755 (quoting 42 U.S.C. § 7607(b)(2)).

We agree with that reasoning. EPA's failure to object within 45 days of the proposed permit's submission allowed Otter Tail's amended permit to be issued and also perfected Sierra Club's right to petition for an objection. That result followed regardless of whether EPA had affirmatively decided not to object or whether it had declined to review the proposed permit at all.[10] § 7661d(b)(2). Absent a petition, the failure to object was the end of EPA's decisionmaking process with respect to the proposed permit. Cf. Bennett v. Spear, 520 U.S. 154, 177–78 (1997) ("Final agency action" under Administrative Procedure Act is that which "mark[s] the consummation of the agency's decisionmaking process" and "from which legal consequences will flow.") (internal quotation marks omitted). Had Sierra Club petitioned for an objection, and had EPA denied the petition, Sierra Club would have been entitled to judicial review. Id.

That Sierra Club failed to take the intermediate step of petitioning for an objection does not change the fact that by following the statutory procedure it "could have . . . obtained" review of its claim that the 2001 modifications triggered NSPS. § 7607(b)(2). District court review of that issue in the present case is therefore barred

_____

[10]EPA did in fact review and comment on the proposed amended permit.

-21-

by § 7607(b)(2).  See Romoland, 548 F.3d at 755; cf. Grand Canyon Trust v. Pub. Serv. Co. of N.M., 283 F. Supp. 2d 1249, 1252–54 (D. N.M. 2003).

Our conclusion is further bolstered by the practicalities of the permitting process and judicial review thereof.  The interpretation Sierra Club urges would allow plaintiffs either to challenge permitting authorities' applicability determinations during the permit review process or to wait and raise the same issues in an enforcement action.  As the Romoland court noted, such a scheme could lead to simultaneous suits by multiple parties raising the same or similar issues.  This would not only waste judicial resources, but could also result in inconsistent decisions.  See Romoland, 548 F.3d at 755.  In addition, to allow plaintiffs to raise issues resolved during the permitting process long after that process is complete would upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies.  See, e.g., United States v. AM Gen. Corp., 34 F.3d 472, 475 (7th Cir. 1994).  Absent clear evidence to the contrary, we must conclude Congress intended a more sensible and efficient regulatory scheme.

Sierra Club also argues that the district court's interpretation of §§ 7661d and 7607(b)(2) effectively excises the "permit shield" provision, 42 U.S.C. § 7661c(f), from the CAA.  As relevant here, the permit shield provides that compliance with its Title V permit can provide an operator with a defense to a claim that certain CAA provisions are applicable, but only if "the permitting authority . . . makes a determination . . . that such other provisions . . . are not applicable and the permit includes the determination or a concise summary thereof."  § 7661c(f)(2).

In this case, DENR determined that NSPS did not apply to the 2001 modifications at Big Stone, but Otter Tail's amended permit did not explicitly incorporate that determination.  The parties do not dispute that the permit shield is accordingly not available to Otter Tail.  Sierra Club argues that by dismissing its

NSPS claim as an impermissible collateral attack on the permit, however, the district court in effect allowed Otter Tail to rely on its permit as a defense without fulfilling the condition imposed by § 7661c(f)(2). Thus, Sierra Club contends, the district court read that provision out of the statute, violating the canon of construction that a court "should avoid a statutory construction that would render another part of the same statute superfluous." United States v. Stanko, 491 F.3d 408, 413 (8th Cir. 2007) (internal quotation marks omitted).

Sierra Club may be correct that the district court's interpretation of §§ 7661d and 7607 restricts the permit shield's applicability, but this does not persuade us that its interpretation is erroneous. While § 7661c(f) is a statutory defense to liability, § 7607(b)(2) limits district court subject matter jurisdiction. To the extent the two provisions are in tension, the jurisdictional limit is paramount. See Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 17–18 (1951) ("The jurisdiction of the federal courts is carefully guarded against expansion by judicial interpretation . . . ."); Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [the] limited jurisdiction" of the federal courts.). Sierra Club argues that our interpretation of the jurisdictional provisions should not curtail the scope of the permit shield, but the more fundamental rule of construction holds that we must not expand federal court jurisdiction in service to a broad reading of the permit shield.

Moreover, our interpretation of § 7607(b) does not render the permit shield entirely superfluous. Our holding is limited to the circumstances of this case. While we decline to delve into other contexts in which the permit shield may play a role, we note that the considerations underlying our decision would not necessarily be present, for example, in EPA enforcement actions, see, e.g., Citizens Against Ruining the Env't v. EPA, 535 F.3d 670, 678–79 (7th Cir. 2008), or where the issues raised in an enforcement action were not ripe for adjudication during the permitting process, see Clean Air Implementation Project v. EPA, 150 F.3d 1200, 1204 (D.C. Cir. 1998).

We conclude that because Sierra Club could have obtained judicial review of its NSPS claim through the process established by 42 U.S.C. § 7661d, district court review of that claim is foreclosed by § 7607(b)(2). Accordingly, the district court did not err in dismissing the claim.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

_____